**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

|  |  |  |
|---|---|---|
| **MATTHEW BIAS**, | ) | |
| | ) | |
| **Plaintiff**, | ) | |
| | ) | **No. 11-CV-2247** |
| **v.** | ) | |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | **Magistrate Judge Cox** |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant**. | ) | |

*MEMORANDUM OPINION AND ORDER*[1]

Plaintiff, Matthew Bias, seeks judicial review of a final decision of the Commissioner of the Social Security Administration ("SSA") denying his application for Social Security Insurance disability benefits under the Social Security Act ("Act"). Mr. Bias has filed a motion for summary judgment [dkt. 20], seeking a judgment reversing the Commissioner's final decision or remanding the matter for additional proceedings. For the reasons set forth below, Mr. Bias's motion is granted in that the matter is remanded to the SSA for further proceedings consistent with this opinion.

---

[1] On June 20, 2011, by the consent of the parties and pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1, this case was assigned to this Court for all proceedings, including entry of final judgment. Dkts. 9, 11.

## I.    PROCEDURAL HISTORY

Matthew Bias applied for Social Security Insurance disability benefits on February 28, 2007.[2] Mr. Bias initially alleged that he had been unable to work since January 1, 2000,[3] because of the disabling conditions of arthritis in his right hip, high blood pressure, Crohn's disease, back problems, and gastroesophageal reflux disease ("GERD").[4] Mr. Bias subsequently amended his disability onset date to December 30, 2005,[5] the day before his insured status expired on December 31, 2005.[6]

The SSA denied benefits to Mr. Bias on May 16, 2007[7] and upheld that denial upon reconsideration on August 23, 2007.[8] Mr. Bias requested a hearing before an Administrative Law Judge ("ALJ"), and ALJ Helen Cropper scheduled a hearing for July 2, 2009.[9] That hearing was postponed, however, until October 1, 2009, in order to receive additional medical records.[10] On November 3, 2009, the ALJ concluded that Mr. Bias was not disabled within the meaning of the Social Security Act.[11] The Appeals Council denied Mr. Bias's request to review the ALJ decision

---

[2]R. at 180.
[3]*Id.*
[4]R. at 194. Crohn's disease is an autoimmune disorder that causes chronic inflammation of the gastrointestinal tract. Symptoms, which include crampy abdominal pain, fever, fatigue, loss of appetite, and persistent diarrhea, can be mild to severe, and can come and go with periods of flare-ups. *Crohn's Disease*, PUBMED HEALTH, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001295/ (last visited Feb. 25, 2012).
[5]R. at 189.
[6]R. at 190.
[7]R. at 99.
[8]R. at 108.
[9]R. at 81-96.
[10]R. at 26, 91-92.
[11]R. at 13-25.

on February 25, 2011.[12] Accordingly, the ALJ's decision is the final decision of the Commissioner of Social Security. Matthew Bias filed this action on April 4, 2011.

II.     FACTUAL BACKGROUND

We now summarize the evidence from the administrative record. After setting forth Mr. Bias's medical history, including his medical treatment and social security records considered by the ALJ, we discuss the administrative hearing testimony. Lastly, we address the ALJ's decision in the case.

A.     Introduction and Treating Physician Medical History

Matthew Bias was born on July 4, 1951, making him fifty-four years old on his last-insured date, December 31, 2005.[13] Mr. Bias did not receive any education beyond a high school sophomore level, though he received some vocational training in electronics in 1970.[14] Mr. Bias worked for U.S. Steel in Gary, Indiana for thirty years, from October 8, 1969 until he took an early retirement on April 7, 2000.[15] At U.S. Steel, Mr. Bias worked in various positions, including utility man, crane operator, hooker, and burner.[16] As a burner, Mr. Bias used a 50 or 60-pound torch throughout his entire shift to smooth the ends of structural beams for bridges.[17] Later, before his retirement, Mr.

---

[12]R. at 1.
[13]R. at 180.
[14]R. at 36-37.
[15]R. at 38-39, 45.
[16]R. at 39, 194.
[17]R. at 41-42, 203.

Bias operated machines that burned through steel slabs.[18] This work was more difficult than his previous assignment because it required operating four machines running at once.[19]

In 2001, after his retirement, Mr. Bias briefly worked as a laborer for a construction contractor to supplement his pension income.[20] Mr. Bias performed tasks like carrying lumber, drywall, and boxes of tile, but had to quit after a few months because he could not perform the necessary lifting or stair climbing.[21] Mr. Bias performed no other work after that.[22]

Mr. Bias's medical history falls into three discernable periods. The first period spans from 2001, shortly after Mr. Bias's retirement, until March 2005. The second occurs after Mr. Bias's last-insured date of December 31, 2005, and lasts until he applied for disability benefits in February 2007. The final period coincides with Mr. Bias's 2009 appeal of his denial of benefits.

1.    Pre-disability Period (2001 to March 2005)

During the first period, Mr. Bias was treated by hospitals and family physicians for several medical conditions, including ongoing treatment for hypertension and GERD.[23] In March 2001, Mr. Bias was admitted to St. Francis hospital for six days, where he was diagnosed with gastrointestinal bleeding and ulcers in his small bowel suggestive of Crohn's disease.[24] In August 2001, Mr. Bias sought treatment at St. Francis hospital for lower back pain and stiffness after he was involved in

---

[18]R. at 43.
[19]R. at 45.
[20]R. at 46.
[21]R. at 46-47.
[22]R. at 47.
[23]*See, e.g.*, R. at 291, 308.
[24]R. at 377-413. A subsequent CT scan of Mr. Bias's abdomen and pelvis in June 2003 showed that his bowel was normal in appearance without any evidence of a mass lesion or inflammatory change. R. at 487.

a car accident where another vehicle rear-ended his car.[25] In December 2001, an x-ray identified mild osteoarthritic changes in Mr. Bias's right hip[26] after he complained of right hip pain and mild lower back pain.[27]

Mr. Bias complained of back pain two other times during this period. In June 2002, Mr. Bias saw his family practitioner because he had been experiencing back spasms and severe back pain that interfered with his sleep.[28] Mr. Bias reported that he was doing a lot of moving and lifting around his house for spring cleaning, and also working in his yard.[29] His physician treated Mr. Bias with a painkiller injection and prescribed an anti-inflammatory drug and a muscle relaxant.[30] Although Mr. Bias visited his physician numerous times during the intervening years, he did not complain of back pain again until March 2005.[31] During this visit, Mr. Bias reported severe low back pain after experiencing a "snap" sensation while getting out of his car.[32] He could walk with difficulty, but was unable to get up onto the exam table because of the pain.[33]

Mr. Bias also sought treatment numerous times during this period for respiratory congestion, bronchitis, and fatigue. In February 2002, Mr. Bias was diagnosed with an upper respiratory infection after complaining of chest congestion and cough for over a month.[34] A year later in 2003, he experienced similar symptoms on January 15, February 28, March 8, and March 17.[35] A series

---

[25]R. at 428-37.
[26]R. at 356.
[27]R. at 341.
[28]R. at 333.
[29]*Id.*
[30]*Id.*
[31]R. at 265-67.
[32]*Id.*
[33]R. at 266.
[34]R. at 335-39.
[35]R. at 316-17, 319-20, 322, 325.

of chest x-rays and a CT scan revealed no acute cardiopulmonary findings.[36] In May 2003, Mr. Bias was diagnosed with fatigue after he reported feeling very tired and not wanting to get out of bed in the morning.[37] He stated that he had difficulty sleeping at night for years, but it had gotten worse in the last week.[38] Mr. Bias was again diagnosed with an upper respiratory infection on December 2, 2003;[39] a bloody cough on December 30, 2003;[40] acute pharyngitis, bronchitis, and fatigue on August 17, 2004;[41] and acute sinusitis and bronchitis on December 6, 2004.[42]

2.      Post-Disability Period (January 2006 to present)

After March 2005, there is a gap in Mr. Bias's medical history, where Mr. Bias maintains he did not seek treatment because he did not have a car to make the forty-five minute trip to his physician's office.[43] Mr. Bias's medical records do not resume until January 30, 2006, a month after his December 31, 2005, last-insured date.

In January 2006, Mr. Bias was again diagnosed with acute bronchitis and prescribed an albuterol inhaler.[44] During a follow-up visit a week later, his physician referred Mr. Bias to a sleep clinic for a sleep apnea study after Mr. Bias reported that he snores, wakes up hyperalert, and feels tired during the day.[45] Mr. Bias's congestion and cold symptoms persisted a month later.[46]

---

[36]R. at 354, 373, 443, 350-51.
[37]R. at 311.
[38]*Id.*
[39]R. at 295-96.
[40]R. at 293.
[41]R. at. 288.
[42]R. at 280.
[43]R. at 59.
[44]R. at 263.
[45]R. at 260.
[46]R. at 258.

Mr. Bias participated in two one-night sleep study sessions on March 2 and 20, 2006.[47] After receiving a diagnosis of severe obstructive sleep apnea,[48] Mr. Bias returned to his physician and was treated for acute pharyngitis and sinusitis on March 22;[49] coughing with phlegm that kept him awake at night on May 4;[50] and sore throat and congestion on October 31, 2006.[51]

Shortly before Mr. Bias applied for disability benefits on February 28, 2007, he complained to his physician that he experienced back and hip pain that disrupted his sleep at night.[52] A right hip x-ray showed some progression of Mr. Bias's mild degenerative arthritis since 2001, but no significant change from that study.[53]

After February 2007, there is another gap in Mr. Bias's medical records that spans two years until January 2009. Mr. Bias testified that he went to see some neighborhood doctors during this time period, but could not see his regular family practitioners because he could no longer afford his medical coverage.[54] He was able to obtain his blood pressure and acid reflux medication as samples from friends who work for pharmaceutical companies.[55] In January 2009, the insurance rates went back down for retirees, and he once again could afford to go back to his regular doctors.[56]

---

[47]R. at 367, 370.
[48]*Id.*
[49]R. at 257.
[50]R. at 256.
[51]R. at 252.
[52]R. at 250-51.
[53]R. at 347.
[54]R. at 63-64.
[55]R. at 65.
[56]R. at 64.

In January 2009, Mr. Bias again complained of back and hip pain.[57] Although another round of hip x-rays revealed no significant change other than mild degeneration,[58] Mr. Bias's physician referred him to an orthopedic specialist.[59] The specialist examined Mr. Bias on February 2 and 23, 2009,[60] noting that Mr. Bias's right hip had been painful for about six years, and he was having difficulty ambulating.[61] The specialist ordered an MRI study of Mr. Bias's hip and lumbar spine, which revealed "possible herniated lumbar disk ... which could be causing the patient's right hip pain."[62]

The orthopedic specialist referred Mr. Bias to a neurosurgeon.[63] The neurosurgeon saw Mr. Bias on April 21, 2009, and noted that the orthopedic specialist did not believe the arthritis in Mr. Bias's hip was a cause of his back pain, opining that degenerative disk disease "might certainly be a big cause of his pain."[64] He recommended nonoperative measures before attempting any type of surgery.[65] The neurosurgeon then referred Mr. Bias for pain management and epidural injections.[66] Mr. Bias received three epidural injections on May 12, June 2, and June 23, 2009.[67] During his July 6, 2009, follow-up exam after the third injection, Mr. Bias reported a sixty percent reduction in overall pain, but he still complained of axial low back pain, radicular pain, and hip pain.[68]

---

[57]R. at 463.
[58]R. at 472.
[59]R. at 481.
[60]R. at 479-80, 477-78.
[61]R. at 479-80.
[62]R. at 478.
[63]*Id.*
[64]R. at 474.
[65]*Id.*
[66]*Id.*
[67]R. at 567, 564-65, 561-62.
[68]R. at 560.

8

B.      SSA History

In addition to Mr. Bias's medical records, the ALJ also considered information Mr. Bias reported to the SSA. In Mr. Bias's Activities of Daily Living questionnaire, completed in April 2007 in conjunction with his disability benefits application, Mr. Bias provided details about his ability to perform tasks around the house.[69] Mr. Bias reported that he performed chores like laundry or making a bed about once a week for two hours and felt tired afterward.[70] In addition, he could shop or cook for about one hour before needing to sit.[71] He stated that he cut grass once per week during the summer.[72] However, by that time, he could no longer run or lift weights, and he could only climb four-to-five stairs at a time.[73] Mr. Bias further reported that he walked with the assistance of a cane when his back went out.[74]

State agency physicians reviewed Mr. Bias's medical record evidence in May and August 2007.[75] Francis Vincent, MD, denied Mr. Bias's claim because there was insufficient evidence to evaluate Mr. Bias's alleged impairments before his date last insured.[76] Three months later, after a request for reconsideration, David Mack, MD, affirmed Dr. Vincent's findings and reiterated that there was insufficient evidence prior to December 31, 2005, to determine disability.[77]

C.      ALJ Hearing

---

[69]R. at 210-12.
[70]R. at 211.
[71]*Id.*
[72]R. at 212.
[73]R. at 211-12.
[74]R. at 211.
[75]R. at 374-76, 454-56.
[76]R. at 374-76.
[77]R. at 454-56.

On October 1, 2009, ALJ Helen Cropper conducted a hearing regarding Mr. Bias's disability claim.[78] Mr. Bias appeared in person and was represented by counsel.[79] The ALJ heard testimony from Mr. Bias and Vocational Expert Pamela Tucker.[80]

Mr. Bias testified that he was not currently working.[81] Mr. Bias stated that his only source of income was his pension from U.S. Steel,[82] and he doubted his ability to perform any kind of work.[83] He explained that even though he believed he would be able to perform laborer work after he retired, he found the work to be too strenuous.[84]

Mr. Bias described several medical impairments that are the basis of his disability claim. Mr. Bias suffered from recurring upper respiratory infections since he was employed at U.S. Steel.[85] He explained that every year, during the winter months, he was constantly experiencing coughing, breathing trouble, and other respiratory problems.[86] Mr. Bias confirmed that during these time periods he saw the doctor every few weeks with respiratory complaints and received prescriptions for antibiotics.[87] Mr. Bias consulted an asbestos doctor and an occupational physician, who found that Mr. Bias's respiratory problems were not caused by exposure to asbestos or industrial irritants while working at U.S. Steel.[88]

---

[78]R. at 26-80.
[79]*Id.*
[80]*Id.*
[81]R. at 38.
[82]R. at 36.
[83]R. at 48.
[84]R. at 49.
[85]R. at 49-50.
[86]R. at 52.
[87]*Id.*
[88]*Id.*

Mr. Bias testified that in December 2001, he experienced pain in his right hip that stemmed from a 1984 car accident injury. Mr. Bias confirmed that his doctor gave him a Toradol injection and prescribed Vicodin and recommended physical therapy.[89] Mr. Bias testified that six months later, he received another Toradol shot to relieve back pain that occurred after he performed yard work and spring cleaning.[90] Mr. Bias admitted that after that visit, he did not mention his hip pain to his doctor, even though he saw his doctor every few weeks to complain about respiratory problems.[91] Mr. Bias explained that over the next couple of years, he self-medicated with over-the-counter arthritis medicine.[92] Mr. Bias remarked that this medicine lost its effectiveness over time and caused stomach problems.[93] Accordingly, Mr. Bias renewed his complaints in 2007, and his doctors sent him to an orthopedic specialist.[94]

Mr. Bias confirmed that in May 2003, he experienced profound fatigue and sleeplessness.[95] Mr. Bias explained that his doctor prescribed antidepressants and a sleeping pill that caused him to feel like a zombie and did not help with the fatigue.[96] According to Mr. Bias, although his doctor believed he was depressed, Mr. Bias disagreed because he did not think had anything to be depressed about.[97] His doctor did not refer Mr. Bias to a psychiatrist or mental health provider.[98]

---

[89]R. at 50.
[90]R. at 51, 333.
[91]R. at 51-52.
[92]R. at 51.
[93]R. at 63.
[94]*Id.*
[95]R. at 53.
[96]*Id.*
[97]R. at 53-54.
[98]*Id.*

In August 2004, Mr. Bias reported to his doctor that he was jogging daily.[99] However, Mr. Bias testified that what he called "jogging" is actually walking at a fast pace a couple of days a week.[100] He explained that he was able to exercise during the summer, which would allow him to nap, alleviating his fatigue.[101] The exercise also helped to control his blood pressure.[102]

Mr. Bias testified that in February 2005, he saw his doctor regarding an elbow injury from lifting weights.[103] According to Mr. Bias, he started performing bicep curls with fifteen-pound weights, but had to stop because the weightlifting caused elbow pain.[104] At this visit, Mr. Bias's doctor noted that Mr. Bias was working out and had changed his diet.[105] He weighed 190 pounds, showing an eighteen-pound loss since the previous March.[106] Mr. Bias stated that his weight fluctuates within five or six pounds of 200, with a high of 209.[107] Mr. Bias explained that he feels better physically when he loses weight, but it did not help his breathing problems.[108]

Mr. Bias testified that about a month later, in March 2005, he went back to the doctor after his back seized while getting out of the car.[109] Mr. Bias described feeling like something in his back had snapped, disconnecting his bottom half from his top half.[110] He could not walk without assistance for seven or eight days.[111] Mr. Bias experienced back stiffness and difficulty sleeping that had been

---

[99] R. at 288-89.
[100] R. at 54.
[101] *Id.*
[102] R. at 268.
[103] R. at 55.
[104] *Id.*
[105] R. at 273.
[106] R. at 268.
[107] R. at 56.
[108] R. at 57.
[109] *Id.*
[110] *Id.*
[111] *Id.*

worsening during the previous year.[112] After his back went out completely, Mr. Bias admitted that the pain gradually subsided; however, he maintained that his range of motion was limited, and he could no longer perform substantial bending or lifting tasks.[113]

Mr. Bias testified that in February 2006, after he reported ongoing respiratory problems, insomnia, fatigue, and acid reflux, his doctor recommended that Mr. Bias participate in a sleep study to determine whether he was getting any sleep at night.[114] Mr. Bias stated that he was diagnosed with severe sleep apnea after spending two nights at a facility.[115] Mr. Bias was prescribed a CPAP machine, which he reported that he abandoned using after about three weeks because it did not help him sleep better.[116] Mr. Bias explained that in order to get sleep, he must take naps all the time.[117] Mr. Bias described feeling like his air is cut off when he tries to sleep in certain positions, explaining, "when I can't breathe, I wake up frightened ... like I'm smothering to death."[118]

Mr. Bias testified regarding how his back and hip conditions currently affect his life. He described sharp pain generating down his leg from his hip that wakes him up at night.[119] Mr. Bias reported that when he stands for an extended period, he feels a sharp back pain like someone is grabbing him in the middle of his back.[120] In addition, Mr. Bias experiences difficulty with suddenly bending over or lifting heavy objects, which interferes with routine tasks like tying his shoes.[121]

---

[112]R. at 58.
[113]*Id.*
[114]R. at 60.
[115]R. at 61.
[116]R. at 61-62.
[117]R. at 62.
[118]*Id.*
[119]R. at 73.
[120]R. at 74.
[121]*Id.*

As a result of these impairments, Mr. Bias testified that he does not believe he could stand long enough to perform a job requiring standing on his feet six out of eight hours a day, five days a week.[122] Mr. Bias further testified that he cannot sit for long periods of time, like for long car rides.[123] Mr. Bias explained that the more active he tries to be, the worse his pain gets.[124] For instance, Mr. Bias noted that if he tries to perform work that involves sitting and standing for too long, like gardening, then he may have to stay in bed the next day, or his back goes out, or he is miserable for another day or so.[125] Mr. Bias explained that as a result, he would have to take days off or leave early.[126]

The ALJ also examined Mr. Bias regarding his daily living activities. Mr. Bias lives alone in a three-bedroom house that he owns.[127] He was never married, but has an adult daughter who served in the military.[128] Mr. Bias testified that he cleans and maintains his house, doing his own cooking, laundry, dishes, and shopping.[129] Mr. Bias stated that he does not go upstairs, however, since climbing stairs started becoming arduous after he retired.[130] Mr. Bias also has a valid driver's license and reported that he drives a couple of days a week to complete errands like going to the doctor's office and the store.[131] Mr. Bias noted that his niece comes over periodically to do things for him, and

---

[122]*Id.*
[123]R. at 74-75.
[124]R. at 75.
[125]*Id.*
[126]*Id.*
[127]R. at 34, 35, 67.
[128]R. at 35, 72.
[129]R. at 67-68.
[130]*Id.*
[131]R. at 37-38.

14

he pays neighbor children to help him with chores, like carrying his groceries into the house and cutting the grass.[132]

Mr. Bias testified that during the first five years after he retired, he spent most of his time at home.[133] Mr. Bias described being an avid gardener who likes helping others with their lawns by suggesting what to plant.[134] In his own garden, Mr. Bias plants and cultivates tomatoes and hot peppers, receiving help with the heavy gardening work.[135] Mr. Bias testified that he could cut his own grass until approximately 2006, when he became unable to push the mower over the grass.[136] In addition to gardening, Mr. Bias stated that his hobbies include playing cards, watching television, and reading newspapers.[137]

Mr. Bias stated that he goes over to his sister's house about once a month to play cards.[138] Mr. Bias explained that they play in the basement because Mr. Bias is unable to climb the stairs to access the rest of her house.[139] In addition, Mr. Bias testified that he is in a relationship with a new girlfriend.[140]

The ALJ then questioned the Vocational Expert ("VE"). The VE classified Mr. Bias's past work experience as a burner as a medium and semi-skilled job, according to the Dictionary of Occupational Titles.[141] She testified that Mr. Bias had not acquired any skills on that job that are

---

[132]R. at 68.
[133]R. at 67.
[134]*Id.*
[135]*Id.*
[136]R. at 68.
[137]R. at 69.
[138]R. at 71.
[139]*Id.*
[140]R. at 72.
[141]R. at 77.

transferable to light or sedentary occupations.[142] The ALJ characterized Mr. Bias as a person who 1) has the residual functional capacity to perform the full range of work at the light exertional level; 2) should not do constant, repetitive pushing or pulling against resistance with the right lower extremity; 3) should never climb ladders, ropes, or scaffolds, or work on moving or unstable surfaces; and 4) should not perform work that exposes him to extremes of temperature, humidity, concentrated respiratory irritants, unprotected heights, or unguarded hazardous equipment.[143] The VE concluded that someone with that RFC would be capable of performing the work of 38,000 cashier positions in the Chicago area. In addition, that person could perform the work of an assembler, which has 4,200 positions, or a light packer, which has 12,000 positions in the Chicago area.[144]

For all of these positions, the VE testified that generally workers are required to work an eight-hour day, with two fifteen-minute breaks and a thirty-minute lunch break.[145] Further, they are not allowed to miss more than one day per month and are required to be on task for approximately ninety-five percent of the workday.[146] The VE confirmed that a worker who was distracted frequently by pain or fatigue to the extent that he was off task and not productive, would not be capable of performing these jobs.[147] A worker would be limited to sedentary employment if that individual could 1) only perform light level work for two days out of the week; 2) only stand for two hours out of the work day; or 3) only lift ten pounds maximum on a frequent basis.[148]

D.      Rule of Law

---

[142]*Id.*
[143]R. at 77-78.
[144]R. at 78.
[145]*Id.*
[146]*Id.*
[147]R. at 79.
[148]*Id.*

To establish a disability under the Social Security Act, a claimant must show an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."[149] Substantial gainful activity includes work that a claimant did before the impairment and any other kind of gainful work generally available in significant numbers within the national economy.[150]

The Social Security regulations provide the five-step sequential evaluation process for the ALJ's determination of whether a claimant is disabled.[151] The ALJ must determine: (1) whether the claimant is currently engaged in any substantial gainful activity; (2) whether the claimant's alleged impairment or combination of impairments is severe; (3) whether any of the claimant's impairments meets or equals any impairment listed in the regulations as being so severe as to preclude substantial gainful activity; (4) whether the claimant is unable to perform his past relevant work; and (5) whether the claimant is unable to perform any other work existing in significant numbers in the national economy.[152] A finding of disability requires an affirmative answer at either step three or step five, while a negative finding at any step other than step three precludes a finding of disability.[153]

In considering a claimant's testimony of his subjective symptoms, the ALJ follows a two-step process.[154] First, she determines whether there is an underlying medically determinable impairment that could reasonably be expected to produce the claimant's symptoms.[155] An impairment is

---

[149]42 U.S.C. § 423(d)(1)(A).
[150]*Id.* § 423(d)(2)(A).
[151]20 C.F.R. § 404.1520(a)(4).
[152]*Id.*
[153]*Craft v. Astrue*, 539 F.3d 668, 674 (7th Cir. 2008).
[154]*See* 20 C.F.R. § 404.1529.
[155]*Id.* § 404.1529(b).

medically determinable if it can be shown by medically acceptable clinical and laboratory diagnostic techniques.[156] Second, the ALJ evaluates the intensity, persistence, and limiting effects of a claimant's ability to do basic work activities.[157] Accordingly, whenever statements about symptoms are not substantiated by objective medical evidence, the ALJ must make a finding on the credibility of the statements based on a consideration of the entire case record.[158] The ALJ considers those symptoms only to the extent that they can reasonably be accepted as consistent with the objective medical evidence and other evidence.[159]

---

[156]*Id.*
[157]*Id.* § 404.1529(c).
[158]*Id.* § 404.1529(c)(4).
[159]*Id.*

E.     The ALJ's Decision

In an opinion issued on November 3, 2009, the ALJ concluded that Mr. Bias was not disabled within the meaning of the Social Security Act on or before his date last insured, December 31, 2005.[160] As an initial matter, the ALJ considered Mr. Bias's insured status. She determined that Mr. Bias's earnings record showed that he had sufficient coverage to remain insured through December 31, 2005.[161] Thus, she concluded that Mr. Bias must establish disability on or before that date to be entitled to disability insurance benefits.[162]

At step one of the five-step process, the ALJ determined that Mr. Bias had not engaged in disqualifying substantial gainful activity since his amended alleged onset date of December 30, 2005.[163]

At step two, the ALJ concluded that Mr. Bias had the medically determinable severe impairments of occasional hip pain, allergies, and frequent respiratory infections.[164] She reasoned that these impairments imposed at least minimal restrictions on Mr. Bias's ability to perform basic work activities.[165] The ALJ stressed that even though the state agency physicians opined that Mr. Bias had no severe impairment, she gave Mr. Bias the "benefit of every due consideration," did not adopt those opinions, and found his impairments to be severe.[166] Accordingly, the ALJ proceeded with her analysis.

---

[160]R. at 16.
[161]R. at 16. *See* 42 U.S.C. § 423(c)(1).
[162]R. at 16.
[163]R. at 18.
[164]*Id.*
[165]*Id.*
[166]R. at 24.

Next, the ALJ found that Mr. Bias's impairments of back pain, sleep apnea, GERD, Crohn's disease, and hypertension caused no more than minimal functional limitations prior to Mr. Bias's date last insured.[167] She reasoned that Mr. Bias was prescribed routine medications to control his hypertension and GERD.[168] She further reasoned that regarding his sleep apnea, Mr. Bias testified that he stopped using the CPAP machine a short time after it was prescribed, and he was not subsequently treated for any sleep-related impairments.[169] Finally, the ALJ noted that Mr. Bias was not treated extensively for Crohn's disease after a 2001 colonoscopy that revealed ulcers.[170] Rather, she pointed out that a 2003 CT scan of Mr. Bias's pelvis showed a normal bowel without any evidence of a mass lesion or inflammation.[171] Thus, the ALJ's analysis concluded that these impairments were non-severe. The ALJ noted that, although she found that Mr. Bias had several non-severe impairments, she considered the limitations from both severe and non-severe impairments in later determining Mr. Bias's residual functional capacity.[172]

The ALJ determined at step three that none of Mr. Bias's impairments or combinations of impairments met or medically equaled any of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 of the SSA regulations.[173] The ALJ reviewed Medical Listing 1.02 (Major dysfunction of a joint(s)) with respect to Mr. Bias's hip pain.[174] She concluded that imaging studies did not show that Mr. Bias had the type of severe anatomical defect contemplated by the listing prior to his date

---

[167]R. at 19.
[168]*Id.*
[169]*Id.*
[170]*Id.*
[171]*Id.*
[172]*Id.*
[173]*Id.*
[174]*Id.*

last insured.[175] She further concluded that, before that date, the record failed to show that Mr. Bias had any significant period of ineffective ambulation.[176] Regarding Mr. Bias's respiratory infections and allergies, the ALJ examined the record and found that it does not establish that these conditions were so severe as to meet the criteria set forth in Medical Listing 3.02 (Chronic Pulmonary Insufficiency) during the relevant time.[177]

Before evaluating steps four and five, the ALJ determined Mr. Bias's residual functional capacity ("RFC") through his date last insured.[178] An individual's RFC is his ability to do physical and mental work activities on a sustained basis despite limitations from impairments.[179] The ALJ determined that Mr. Bias had the RFC to perform most light work as defined in 20 C.F.R. 404.1567(b).[180] In addition, she found that because of his remote history of hip injury, Mr. Bias should not perform work requiring repetitive pushing or pulling against resistance with the right lower extremity.[181] Further, because of his complaints of sleepiness, she recommended Mr. Bias should not perform work that requires that he climb ladders, ropes, or scaffolds; work on moving or unstable surfaces; or work at unprotected heights or around hazardous equipment.[182] She found that Mr. Bias could occasionally bend, stoop, kneel, crouch, and crawl.[183] However, she concluded that because of his respiratory complaints, Mr. Bias should not perform work that would expose him to

---

[175]*Id.*
[176]*Id.*
[177]*Id.*
[178]R. at 20.
[179]R. at 17.
[180]R. at 20.
[181]*Id.*
[182]*Id.*
[183]*Id.*

extremes of temperature, humidity, or concentrated respiratory irritants.[184] The ALJ noted that in making these findings, she considered both the medical evidence and the credibility of Mr. Bias's testimony.[185]

The ALJ focused on the complaints, medications and treatment provided by Mr. Bias's primary care physicians between January 2005 and February 2007.[186] She found the treatment notes from those clinic visits most often addressed Mr. Bias's complaints of respiratory infections, bronchitis, and a sore throat, and that Mr. Bias generally reported a good response to the routine medications prescribed.[187] The ALJ also noted that Mr. Bias was treated occasionally during the relevant time period for other complaints, including elbow pain, sleep problems, and a sudden onset of severe lower back pain in March 2005.[188] She stressed that Mr. Bias did not make further documented complaints to his primary care physician of severe back pain until 2009.[189] She thus concluded that Mr. Bias did not complain of frequent or persistent severe hip pain or back pain prior to his last insured date of December 31, 2005.[190]

In weighing the objective medical evidence with Mr. Bias's subjective allegations of disabling symptoms during the relevant time period, the ALJ concluded that the preponderance of the evidence showed that Mr. Bias did not suffer from a disabling condition during that time.[191] The ALJ's analysis found that in spite of his respiratory condition, Mr. Bias's daily activities did not reflect a severely

---

[184]*Id.*
[185]*Id.*
[186]*Id.*
[187]*Id.*
[188]R. at 21.
[189]*Id.*
[190]*Id.*
[191]*Id.*

reduced capacity to perform basic work activities.[192] She noted that in 2002 Mr. Bias reported to his treating physician that he was able to move furniture and work in his yard; in 2003 he cut grass and did laundry; and in March 2005 he lifted weights for exercise.[193] Moreover, she noted that Mr. Bias testified that he lived alone during the relevant time period and was able to maintain his single-family home by himself, including cooking, cleaning, and some hobby gardening.[194]

The ALJ found that Mr. Bias's medically determinable impairments could reasonably be expected to cause his alleged symptoms; however, she determined that his statements concerning the intensity, persistence and limiting effects of those symptoms were not credible to the extent that they were inconsistent with the RFC assessment at the time of Mr. Bias's alleged onset date and last insured date.[195] The ALJ explained that because the relevant time period is so remote, she gave greater weight to the contemporaneous medical records and Mr. Bias's contemporaneous reports of his symptoms than to Mr. Bias's current memory of the past.[196] She reasoned that while Mr. Bias made a few documented complaints of the musculoskeletal impairments, which became much more severe over time, she found little evidence that those impairments caused significant limitations during the relevant time period.[197] For instance, she noted that Mr. Bias submitted no evidence that he needed strong pain medication prior to the date last insured, even though his treating physicians usually were responsive to his complaints.[198] The ALJ determined that, ultimately, Mr. Bias did not make frequent or consistent complaints to his physicians of prolonged pain, fatigue, or other disabling

---

[192]R. at 22-23.
[193]R. at 23.
[194]Id.
[195]Id.
[196]Id.
[197]Id.
[198]Id.

symptoms prior to the date last insured.[199] On the contrary, the ALJ observed that he often mentioned to his treating physician that he was trying to stay relatively active.[200]

Moving on to step four, the ALJ concluded that Mr. Bias was unable to perform his past relevant steelworker work because that position was performed at the medium exertional level and is semi-skilled, with no transferable skills to a light level of employment.[201]

Finally, the ALJ determined at step five that Mr. Bias was not disabled through the date last insured because there were jobs that existed in significant numbers in the national economy that Mr. Bias could have performed, considering his age, education, work experience, and RFC.[202] If a claimant can perform all or substantially all of the exertional demands at a given level of exertion, then the Medical-Vocational Guidelines in 20 C.F.R. Part 404, Subpart P, Appendix 2, direct a conclusion of "not disabled."[203] The ALJ determined that the vocational expert identified occupations that exist in significant numbers that her hypothetical worker with Mr. Bias's RFC could perform and sustain.[204] The ALJ excluded proposed additional hypothetical limitations or impairments greater or more limiting that those included in her RFC conclusion because she did not find them to be supported by the objective medical and other evidence.[205] Therefore, the ALJ concluded that Mr. Bias was not disabled under the Act.[206]

---

[199] *Id.*
[200] *Id.*
[201] R. at 24.
[202] *Id.*
[203] *Id.*
[204] *Id.*
[205] *Id.*
[206] *Id.*

III.   STANDARD OF REVIEW

The reviewing court must sustain the Commissioner's findings as to any fact if it is supported by substantial evidence and is free from legal error.[207] Substantial evidence is such relevant evidence that a reasonable mind might accept as adequate to support a conclusion.[208] The standard of review is deferential; however a reviewing court must conduct a critical review of the evidence before affirming the Commissioner's decision.[209] Although the ALJ need not address every piece of evidence or testimony presented,[210] she must adequately discuss the issues and build an accurate and logical bridge from the evidence to conclusion.[211]

IV.   ANALYSIS

Mr. Bias argues that this Court should reverse the Commissioner's denial of disability benefits because 1) the ALJ did not properly support her RFC finding with some medical basis or basis in fact;[212] and 2) the ALJ's credibility determination was flawed.[213] Aside from these arguments, we first discuss the ALJ's decision to limit her disability analysis to Mr. Bias's complaints and treatment during the time period surrounding his date last insured. Then we turn to Mr. Bias's arguments regarding the ALJ's RFC and credibility determinations.

---

[207] 42 U.S.C. § 405(g).
[208] *McKinzey v. Astrue*, 641 F.3d 884, 889 (7th Cir. 2011).
[209] *Eichstadt v. Astrue*, 534 F.3d 663, 665 (7th Cir. 2008).
[210] *Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010).
[211] *McKinzey*, 641 F.3d at 889.
[212] Dkt. 35 at 2.
[213] *Id.* at 6.

A.      The ALJ's Temporal Limitation on Mr. Bias's Claim

As an initial matter, two factual limitations complicate Mr. Bias's claim. First, because Mr. Bias's last insured date is December 31, 2005,[214] and his alleged disability onset date is December 30, 2005,[215] the ALJ must ultimately determine whether Mr. Bias was disabled during that relevant time.[216] Accordingly, the ALJ explained that she focused on the complaints, medications, and treatment provided between January 2005 through February 2007, giving less weight to more recent or remote symptoms and treatment.[217] Second, for the period from March 2005 until January 2006, inclusive of Mr. Bias's date last insured, there is a gap in the medical evidence where Mr. Bias was not treated by his primary care physicians because he had no transportation to the clinic.[218] Thus, the ALJ had no directly contemporaneous evidence to rely upon for the nine months preceding Mr. Bias's date last insured.

The ALJ's task in determining whether Mr. Bias was disabled was especially difficult in light of these limitations and the substantial amount of more recent medical evidence and testimony. In comparable circumstances, the Seventh Circuit has opined that

> [t]he administrative law judge should either have determined whether the plaintiff's ailments are at present totally disabling, and, if so, have retained a medical expert to estimate how grave [the plaintiff's] condition was . . . [at the time of] the last date before her coverage expired; or the judge should have determined directly whether the plaintiff was totally disabled by then - but in making that determination he must (as under the first approach)

---

[214]R. at 190.

[215]R. at 189.

[216]*See* 42 U.S.C. § 423(a)(1)(A), (c)(1); 20 C.F.R. § 404.131; *Stevenson v. Chater*, 105 F.3d 1151, 1154 (7th Cir. 1997).

[217]R. at 20.

[218]R. at 59.

26

consider all relevant evidence, including the evidence regarding the plaintiff's condition at present.[219]

The court's first option comports with the requirements S.S.R. 83-20, which establishes the method for determining the onset date of a disability after the ALJ finds that a claimant is disabled as of a date after the date last insured.[220] With slowly progressing impairments, where the claimant's medical chronology is not complete or adequate medical records are not available, the ALJ generally should consult a medical expert to infer the onset date.[221] Importantly, however, the Seventh Circuit and other courts have found that a S.S.R. 83-20 analysis is not appropriate when, as in Mr. Bias's case, the ALJ does not first find the claimant is disabled sometime after the date last insured.[222]

Because the ALJ focused on the time period surrounding Mr. Bias's date last insured, she did not make a finding concerning whether Mr. Bias was disabled after that date.[223] As a result, the ALJ gave less consideration to the most recent objective medical evidence, including Mr. Bias's treatment for back pain as well as all of Mr. Bias's subjectively reported symptoms. Even the Seventh Circuit's second option, which does not require a determination of present disability, stresses the importance of considering relevant evidence of the claimant's present condition. In addition, the ALJ's analysis meant that she did not consider whether she should seek the assistance of a medical expert to address

---

[219] *Parker v. Astrue*, 597 F.3d 920, 925 (7th Cir. 2010) (citations omitted) (holding that the ALJ failed to evaluate how the plaintiff's depression and PTSD symptoms, which worsened and were treated after her date last insured, may have impacted her ability to work at that date).

[220] S.S.R. 83-20 at *1 (1983).

[221] *Henderson ex rel. Henderson v. Apfel*, 179 F.3d 507, 513 (7th Cir. 1999).

[222] R. at 16 ("I conclude the claimant was not under a disability . . . *on or prior to the claimant's date last insured*, December 31, 2005.") (emphasis added); *see, e.g.*, *Scheck v. Barnhart*, 357 F.3d 697, 701 (7th Cir. 2004) ("The ALJ did not find that Scheck was disabled, and therefore, there was no need to find an onset date. In short, S.S.R. 83-20 does not apply."); *Sam v. Astrue*, 550 F.3d 808, 810 (9th Cir. 2008) (holding that S.S.R. 83-20 does not require a medical expert where the ALJ explicitly finds that the claimant has never been disabled).

[223] R. at 16.

the history and progression of the disease process.[224] Given the inferences that the ALJ necessarily made because of 1) gaps in Mr. Bias's treatment record during the relevant time period and 2) the lack of a state agency physician or treating physician opinion regarding disability, consulting a medical expert may have been useful for determining disability.

Although Mr. Bias does not make the argument now, the attorney who represented Mr. Bias at his ALJ hearing argued that Mr. Bias suffered disabling impairments before his date last insured that were not confirmed by objective testing until after that date.[225] She argued that Mr. Bias reported these symptoms before his date last insured, indicating that his impairments were present before that date.[226] The Seventh Circuit has held that "medical evidence from a time period subsequent to a certain period is relevant to the determination of a claimant's condition during that period. Any other rule would restrict unduly the availability of benefits under the Act."[227]

Although the ALJ acknowledged that Mr. Bias reported "severe" hip pain in February 2007 and "persistent and severe" back pain in 2009, she rejected this evidence because Mr. Bias "did not make documented complaints of frequent or persistent severe hip pain or back pain prior to [Mr. Bias]'s date last insured of December 31, 2005."[228] Further, she asserted that "while [Mr. Bias] made a few documented complaints during the relevant time period of the musculoskeletal impairments that eventually became much more severe, there is little evidence that he had significant limitations caused by those impairments during the remote relevant time period."[229] The ALJ's analysis suggests

---

[224]S.S.R. 83-20 at *3 ("At the hearing, the administrative law judge (ALJ) should call on the services of a medical advisor when onset must be inferred.")

[225]R. at 33.

[226]*Id.*

[227]*Halvorsen v. Heckler*, 743 F.2d 1221, 1225 (7th Cir. 1984) (citation omitted).

[228]R. at 21.

[229]R. at 23.

that Mr. Bias may be disabled as of a later date, as his impairments progressively became more severe. Thus, applying the analytical framework of S.S.R. 83-20 would have been appropriate to analyzing this evidence. Moreover, because of the ten-month gap in Mr. Bias's medical record surrounding his date last insured, an S.S.R. 83-20 analysis would have required that the ALJ examine other sources of evidence to establish Mr. Bias's condition at that time.[230] Because we are remanding this matter on other bases, we decline to decide whether the ALJ's temporal limitation on her analysis constitutes reversible error; however, we do find that the two approaches outlined by the Seventh Circuit may be particularly useful.

B.      The ALJ's RFC Determination

Mr. Bias contends that the ALJ's RFC determination was flawed because she failed to follow the narrative requirements in the SSA's Policy Interpretation Ruling S.S.R. 96-8p[231] and explain her basis for reaching her RFC determinations regarding Mr. Bias's ability to perform light work with several environmental and functional restrictions.[232] We agree that in several instances the ALJ failed to provide a logical link between the evidence and her RFC determinations. However, we reject several other alleged flaws in the RFC analysis.

1.      Light Work and Environmental and Functional Restrictions

Mr. Bias argues that the ALJ reached an RFC finding without explaining what basis, medical or otherwise, she used to reach her conclusions.[233] The ALJ determined that Mr. Bias had the RFC

---

[230]S.S.R. 83-20 at *2-*3.
[231]Dkt. 21 at 8-10.
[232]*Id.* at 6-8.
[233]*Id.* at 6.

to perform most light work through his date last insured.[234] In addition, she identified several restrictions on Mr. Bias's ability to work as of his date last insured:

> Because of his remote history of hip injury, claimant should not have performed work requiring repetitive pushing or pulling against resistance with the right lower extremity. Because of his complaints of sleepiness, he should not have performed work that would require that he climb ladders, ropes or scaffolds, work on moving or unstable surfaces or work at unprotected heights or around hazardous equipment. Despite his musculoskeletal complaints, [Mr. Bias] could occasionally bend, stoop, kneel, crouch and crawl. Because of his respiratory complaints, he should not have performed work that would expose him to extremes of temperature, humidity, or concentrated respiratory irritants.[235]

Mr. Bias argues that even though the ALJ's RFC finding included these specific environmental restrictions, she did not demonstrate how she relied on any medical or factual basis in deciding which restrictions to include or exclude.[236] Moreover, Mr. Bias asserts that the ALJ failed to specifically explain how Mr. Bias would be able to perform most light work, including sitting and standing for six to eight hours per workday and lifting twenty pounds occasionally.[237] Conversely, the Commissioner argues that the medical evidence on record supports the ALJ's decision and that the ALJ considered and discussed Mr. Bias's treatment history and physician opinions.[238]

In order to meet the narrative requirement of S.S.R. 96-8p, an ALJ must build an "accurate and logical bridge from the evidence to her conclusion."[239] The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts and nonmedical evidence.[240]

---

[234]R. at 20.

[235]*Id.*

[236]Dkt. 21 at 6.

[237]Dkt. 35 at 4.

[238]Dkt. 31 at 5.

[239]*Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000).

[240]S.S.R. 96-8p at *7.

The ALJ was required to articulate her reasoning for the conclusion that Mr. Bias could complete light work. "Light work" involves "lifting no more than [twenty] pounds at a time with frequent lifting or carrying of objects weighing up to [ten] pounds."[241] While lifting weight may be infrequent, a job is deemed "light work" "when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls."[242] An individual deemed to be capable of light work "must have the ability to do substantially all of [the abovementioned] activities."[243]

The ALJ does not explain her finding that Mr. Bias could meet the light work lifting requirements. Although she notes that Mr. Bias told his doctor in 2005 that he lifted weights for exercise,[244] she does not tie this fact to her light work determination. Instead she uses it to undermine Mr. Bias's credibility, ambiguously remarking that his daily activities were not limited "to the extent one would expect," given Mr. Bias's complaints of disabling symptoms and limitations.[245] Moreover, she overlooked the fact that Mr. Bias reported his weightlifting to his doctor because he experienced elbow pain from lifting fifteen-pound weights.[246] The ALJ failed to analyze how this relevant evidence fit in with her light work RFC determination.

In addition, the ALJ did not explain how she found that Mr. Bias could perform work that "requires a good deal of walking or standing."[247] Rather, she only generally concluded that "[a] review of [Mr. Bias]'s daily activities does not reflect that [Mr. Bias] had a severely reduced capacity

---

[241]20 C.F.R. § 404.1567(b).
[242]*Id.*
[243]*Id.*
[244]R. at 23.
[245]*Id.*
[246]R. at 55.
[247]20 C.F.R. § 404.1567(b).

to perform basic work activities."[248] Nowhere in the decision does the ALJ explain how Mr. Bias's daily living activities, such as maintaining his single-family home by himself, cooking, cleaning, and hobby gardening, indicate that he can sustain a job that involves frequent walking or standing.[249] Thus, the ALJ does not establish that Mr. Bias could complete the requirements of light work.

With respect to Mr. Bias's individualized environmental and functional restrictions, the ALJ supported her RFC determination by tying each restriction to a specific impairment from Mr. Bias's medical record. For instance, she found that Mr. Bias should not perform work requiring repetitive pushing or pulling against resistance with the right lower extremity because of his hip injury.[250] The ALJ further explained that she considered the limitations imposed by all severe and non-severe impairments in determining Mr. Bias's RFC.[251]

However, the ALJ did not analyze how Mr. Bias's impairments would affect his ability to perform work at the light level. For instance, she concluded that despite Mr. Bias's musculoskeletal complaints, he could occasionally bend, stoop, kneel, crouch, and crawl.[252] Although she found that there was little evidence that these musculoskeletal impairments caused "significant limitations" during the relevant time period,[253] she did not explain how she concluded that his impairments were so non-limiting that he could occasionally perform such tasks. In particular, the ALJ did not address Mr. Bias's testimony that after his back went out completely in March 2005, his range of motion remained limited even after the pain subsided, and he could no longer engage in substantial bending

---

[248] R. at 22.
[249] R. at 23.
[250] R. at 20.
[251] R. at 19.
[252] R. at 20.
[253] R. at 23.

or lifting.[254] We therefore remand back to the ALJ for further inquiry and clarification on how Mr.

Bias's limitations affected his ability to perform light work.

2.      Other Alleged Flaws in the RFC Analysis

In addition, Mr. Bias argues that the ALJ's RFC determination was flawed because 1) she

should not have substituted the state agency physicians' opinions with her own lay opinion; 2) she

did not explain why she rejected Mr. Bias's testimony about his extreme fatigue and need to nap

during the day; 3) she had no medical basis for limiting Mr. Bias from working around only

concentrated respiratory irritants; and 4) she failed to take into account Mr. Bias's obesity in

determining his RFC. We address our reasons for rejecting each argument in turn.

First, Mr. Bias argues that, after rejecting the opinions of the state agency physicians, the ALJ

was not permitted to substitute the physicians' opinions with her own lay opinion.[255] Mr. Bias cites

*Suide v. Astrue*, where an ALJ rejected a treating physician's RFC report because the physician had

been treating the claimant for only one month and because the objective findings did not support the

physician's restrictive limitations.[256] However, the state agency physicians who evaluated Mr. Bias's

claim did not make an RFC determination and instead concluded that there was insufficient evidence

to evaluate Mr. Bias's impairments.[257] Had the ALJ adopted these findings, Mr. Bias would have been

worse off because the ALJ's analysis would have ended at step two with a determination that he had

---

[254]R. at 58.
[255]Dkt. 35 at 2.
[256]371 F. App'x 684, 688 (7th Cir. 2010).
[257]R. at 374-76, 454-56.

no severe impairment and was not disabled.[258] On the contrary, the ALJ explained that she gave Mr. Bias the benefit of every due consideration in finding that Mr. Bias had severe impairments.[259]

Mr. Bias also argues that the ALJ did not explain why she rejected Mr. Bias's testimony about needing to nap during the day or how his extreme fatigue prevented him from completing tasks.[260] He asserts that evidence shows that he had trouble sleeping through the night as far back as 2003, indicating that his sleep apnea existed before it was diagnosed in March 2006.[261] The ALJ determined that Mr. Bias's sleep apnea caused no more than minimal functional limitations prior to Mr. Bias's date last insured.[262] She reasoned that Mr. Bias's sleep apnea was a non-severe impairment because Mr. Bias stopped using the prescribed CPAP machine after only a short time and he was not subsequently treated for any sleep-related impairments.[263] Despite this determination, she accounted for a sleep impairment in her RFC decision, finding that "because of his complaints of sleepiness," Mr. Bias should not perform work that requires that he climb ladders, ropes, or scaffolds; work on moving or unstable surfaces; or work at unprotected heights or around hazardous equipment.[264]

Next Mr. Bias argues that the ALJ did not have a medical basis for limiting Mr. Bias from working around *concentrated* respiratory irritants as opposed to *any* respiratory irritant.[265] He contends that the ALJ should have solicited the advice of a medical expert regarding this limitation.[266] SSA regulations require the ALJ to summon a medical expert if necessary to provide an informed

---

[258]*See* 20 C.F.R. § 404.1520(a)(4).
[259]R. at 18.
[260]Dkt. 21 at 9-10. *See* R. at 62.
[261]Dkt. 21 at 9. *See* R. at 60-62, 288-89, 311.
[262]R. at 19.
[263]*Id.*
[264]R. at 20.
[265]Dkt. 21 at 8.
[266]*Id.*

basis for determining whether the claimant is disabled.[267] However, it is within the ALJ's discretion to consult an expert.[268] Although Mr. Bias makes a point that the ALJ may have made her own medical conclusion, Mr. Bias's respiratory impairments were not the basis of his disability application.

Finally, Mr. Bias contends that the ALJ failed to take into account Mr. Bias's obesity in determining his RFC, despite evidence that he was obese.[269] He argues that the ALJ failed to discuss how Mr. Bias's obesity affected his ability to stand, walk, or perform the postural requirements of work within his RFC, in light of Mr. Bias's arthritic hip, back pain, sleep apnea, and respiratory problems.[270] In the cases Mr. Bias cited where ALJ decisions were reversed for failure to consider obesity, the claimants were substantially or morbidly obese.[271] Although Mr. Bias's weight fluctuated between 209 and 190 pounds, even at his heaviest, Mr. Bias was only borderline obese, with a body mass index of 31.6 where a BMI of 30.0 constitutes obesity.[272] Moreover, during the relevant time period, Mr. Bias was only overweight, not obese. In February 2005, Mr. Bias's doctor noted that Mr. Bias was working out and had changed his diet.[273] He weighed 190 pounds, showing an eighteen-

---

[267]See 20 C.F.R. § 416.927(a)(3); *Green v. Apfel*, 204 F.3d 780, 780 (7th Cir. 2000).

[268]See *Luna v. Shala*, 22 F.3d 687, 692–93 (7th Cir. 1994).

[269]Dkt. 21 at 10-12.

[270]*Id.* at 11.

[271]See *Villano v. Astrue*, 556 F.3d 558, 560 (7th Cir. 2009) (where claimant is 5'7" with a weight fluctuating between 291 and 344 pounds); *Gentle v. Barnhart*, 430 F.3d 865, 868 (7th Cir. 2005) (where claimant is 5'11" and weighs 275 pounds); *Barrett v. Barnhart*, 355 F.3d 1065, 1065 (7th Cir. 2004) (where claimant is 5'1" and weighs more than 300 pounds); *Accurso v. Astrue*, 10 C 0968, 2011 WL 578849 at *1 (N.D. Ill. Feb. 9, 2011) (where claimant weighs more than 400 pounds and is morbidly obese).

[272]S.S.R. 02-1p at *2; R. at 56, 58, 273, 289, 292. Body mass index calculation is based on Standard BMI Calculator, http://www.nhlbisupport.com/bmi/ (last visited Mar. 5, 2012).

[273]R. at 273.

pound loss since the previous March.[274] Mr. Bias testified that he felt better physically when he lost weight, but it did not help his breathing problems.[275] Thus, the ALJ permissibly did not consider Mr. Bias's weight in her RFC determination.

C.      The Credibility Determination

Mr. Bias contends that the ALJ failed to properly explain her credibility finding regarding Mr. Bias's complaints of pain[276] and engaged in a conclusory analysis prohibited by S.S.R. 96-7p.[277] We find that, even though the ALJ did not apply the Seventh Circuit's analytical framework, she adequately explained the weight she gave to Mr. Bias's statements and supported her determination with evidence in the record.

Because hearing officers are in the best position to see and hear witnesses and assess their forthrightness, ALJ credibility determinations will not be overturned unless "patently wrong."[278] Although an ALJ may not reject a claimant's subjective complaints "solely because they are not fully supported by the medical [evidence, the ALJ] may consider that [lack of support] as probative of the claimant's credibility."[279] Accordingly, whenever statements about symptoms are not substantiated by objective medical evidence, the ALJ must make a finding on the credibility of the statements based on a consideration of the entire case record.[280] The ALJ considers those symptoms only to the

---

[274]R. at 268.
[275]R. at 57.
[276]Dkt. 21 at 12-14.
[277]*Id.* at 14-15.
[278]*Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir 2000).
[279]*Id.*
[280]20 C.F.R. § 404.1529(c)(4).

extent that they can reasonably be accepted as consistent with the objective medical evidence and other evidence.[281]

Mr. Bias asserts that the ALJ only partially fulfilled her duty in investigating Mr. Bias's pain complaints because she glossed over the nature and intensity of his pain.[282] In addition, Mr. Bias argues that the ALJ failed to explain why she did not find Mr. Bias's pain complaints credible or how they were inconsistent with the record.[283] However, the bulk of the testimony Mr. Bias cites to support his pain complaints refers to Mr. Bias's condition at the time of the hearing in 2009, not at the time of the date last insured.[284] The ALJ gave greater weight to the contemporaneous medical records, and to Mr. Bias's contemporaneous reports of his symptoms at the time the records were made, than to his current testimony about his past condition.[285] Thus, the ALJ gave less consideration to Mr. Bias's complaints not necessarily because she did not find them credible, but because she found they were not relevant to her disability determination. As discussed above, had the ALJ applied the Seventh Circuit's recommended analytical framework, she would have given appropriate weight to Mr. Bias's present condition and pain symptoms, which are relevant in determining whether he is disabled.

Finally, Mr. Bias argues that the ALJ engaged in a conclusory analysis prohibited by S.S.R. 96-7p.[286] The regulation requires that a credibility determination

> must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any

---

[281]*Id.*
[282]Dkt. 21 at 13.
[283]*Id.* at 14.
[284]*See, eg.*, R. at 73-74
[285]R. at 23.
[286]Dkt. 21 at 14-15.

subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.[287]

Mr. Bias alleges that the ALJ "turn[ed] the credibility determination process on its head" by rejecting the credibility of all Mr. Bias's statements except those that supported the ALJ's findings, rather than evaluating credibility as an initial matter.[288] Mr. Bias further alleges that the ALJ incorrectly emphasized evidence that matched her RFC finding, providing only a minimal analysis of the evidence of Mr. Bias's impairments that bolstered his credibility.[289] However, Mr. Bias does not identify which evidence the ALJ failed to analyze or provide examples of conclusory analysis within her decision.

We find that the ALJ adequately explained the weight she gave to Mr. Bias's statements, as discussed above, and supported her determination with evidence in the record.[290] Significantly, the ALJ engaged in an extensive two-page summary and analysis of Mr. Bias's testimony, setting forth the evidence she relied upon in coming to her credibility determination.[291] In particular, the ALJ focused on Mr. Bias's daily activities and concluded that his ability to be active and care for himself and his single-family home on his own "does  not reflect that the claimant had a severely reduced capacity to perform basic work activities."[292] The ALJ further noted that Mr. Bias did not submit evidence that he needed strong pain medication and did not make frequent or consistent complaints

---

[287]S.S.R. 96-7p at *2.

[288]*Brindisi ex. rel. Brindisi v. Barnhart*, 315 F.3d 783, 787-88 (7th Cir. 2003) (holding that an ALJ's conclusory two-sentence credibility determination improperly found statements that supported the ALJ's ruling credible and rejected the statements that did not).

[289]Dkt. 35 at 8.

[290]*Brindisi*, 315 F.3d at 788 (finding that the ALJ errored when "the ALJ d[id] not explain the weight given to the [claimant's] statements and d[id] not support its determination with any evidence in the record").

[291]R. at 22-23.

[292]R. at 22.

to his physicians of disabling symptoms during the relevant time period.[293] Thus, she found that Mr. Bias's statements concerning the intensity, persistence, and limiting effects of his symptoms were not credible to the extent that they were inconsistent with this evidence.

VI.     CONCLUSION

For the reasons set forth above, Mr. Bias's motion for summary judgment is granted [dkt. 20]. We remand the case to the Social Security Administration for further proceedings consistent with this opinion.

IT IS SO ORDERED.

**Date: April 30, 2012**

U.S. Magistrate Judge

Susan E. Cox

---

[293]R. at 23.